UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SIERRA CLUB,

                           Plaintiff,                              Case No. 15-cv-10154

v                                                  Honorable Thomas L. Ludington

UNITED STATES FOREST SERVICE et al.,

                           Defendants.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT, AND DISMISSING COMPLAINT WITH PREJUDICE

Before the Court are cross-motions for summary judgment brought by Plaintiff Sierra Club, Defendant U.S. Forest Service, and Defendant Enbridge Energy. The Enbridge Line 5 pipeline, originally constructed in 1953 and stretching nearly 1100 miles, transports crude oil between Superior, Wisconsin and Sarnia, Ontario. FS0129. At issue in this case is the 8.1 mile section of the pipeline that travels through the Mio District of the Huron-Manistee National Forest (the "Mio District pipeline"). Plaintiff alleges that the U.S. Forest Service improperly failed to conduct a proper environmental analysis pursuant to the National Environmental Policy Act ("NEPA") when it reissued a thirty-year special use permit (the "2015 Permit") allowing Enbridge Energy to continue operating the Mio District pipeline. ECF No. 1. Specifically, Plaintiff claims that Defendant Forest Service wrongfully invoked a "Categorical Exclusion" ("CE") from NEPA under 36 C.F.R. 220.6(e)(15), and that it needed to undertake either an Environmental Assessment ("EA") or a full Environmental Impact Statement ("EIS") prior to the issuance of the permit. *Id.*

Plaintiff now seeks a declaration that Defendant Forest Service failed to comply with NEPA and the APA in issuing the 2015 Permit to Enbridge Energy, and requests an injunction against Defendants from undertaking any activities related to the permit until the U.S. Forest Service complies with NEPA and the APA, an award of reasonable attorney's fees and costs, and any other just and equitable relief.  *See* Pl. Mot. Summ. J., ECF No. 27; ECF No. 1.  Defendant Forest Service and Defendant Enbridge move for judgment on all of Plaintiff's claims. Def. Forest Service Mot. Summ. J., ECF No. 37, Def. Enbridge Mot. Summ. J., ECF No. 40. Defendants' motions will be granted and Plaintiff's motion will be denied.

## I.

### A.

On July 26, 1954, a special use permit was issued to Lakehead Pipeline Company, Inc. authorizing the construction, operation, and maintenance of the Mio District pipeline. FS1291-96.  The right-of-way ("ROW") authorized by the special use permit includes a parcel of land 60 feet wide and 8.1 miles long. *Id.*

In 1992, after Lakehead changed its name to the Lakehead Pipeline Company, Limited Partnership, a Delaware Limited Partnership, the Forest Service issued a new special use permit (the "1992 Permit") that reflected the name change and authorized the continued use of the ROW.  *See* FS1044-45. The 1992 Permit provided that the holder was required to take all necessary measures to protect the health and safety of persons affected by the pipeline activities and promptly cease any activities that caused, among other things, "serious and irreparable harm or damage to the environment…." FS1047.   It further provided that the holder was required to "conduct all activities associated with the pipeline in a manner that will avoid or minimize

degradation of air, land, and water quality." FS1048. The 1992 Permit was set to expire December 31, 2012, and contained the following provision:

> If the right-of-way project or facility is still being used for the purpose(s) previously authorized and is being operated and maintained in accordance with all the provisions of the authorization, if renewal is allowed under then existing law, and if the use is determined to be consistent with the then existing resource management plans for the affected land, the authorized officer shall renew the authorization for a term he deems to be reasonable under the circumstances.

FS1049.

The 1992 Permit was amended on April 10, 2002, after Lakehead changed its name to Enbridge Energy Limited Partnership (Enbridge). FS1058-70. The title page of that amendment specifically states that "only the name of the company has changed not the ownership" and that "[a]ll other conditions of the permit as amended, remain unchanged. *Id*.

In 2010, a different pipeline owned by Enbridge ruptured, causing a release of an estimated 843,000 gallons of crude oil into Talmadge Creek and the Kalamazoo River. FS0832, FS0841, FS0877, FS1120. In response to this spill, Enbridge requested an additional amendment to the 1992 Permit on May 16, 2011, seeking to voluntarily install a remote shutoff valve. FS1092-98; FS1120. The Forest Service approved this amendment in October of 2012. FS0994-FS1007. Thereafter, on November 6, 2012, the 1992 Permit was amended a third time to allow Enbridge to install an additional emergency shutoff valve. FS0846. These voluntary upgrades allow Enbridge to respond remotely in the event of any emergency, and are intended to prevent any potential spill from reaching the Au Sable River. FS0996; FS1120.

As of 2011, Line 5 carried 22 million gallons of crude oil a day under the Au Sable River. FS1120. As of April, 2013, the Mio District Pipeline had never been completely surveyed, either before or after its installation over 60 years ago. FS0500.

- 3 -

On September 26, 2012, Enbridge requested renewal of their special use authorization which was set to expire on December 31, 2012. FS0190-96. The Forest Service and Enbridge finalized a Cost Recovery Agreement for the authorization on May 14, 2013 through which Enbridge would financially support the Forest Service's activities to assess any potential impact of reauthorization. *See* FS0489-94; FS0500; FS0911-34; FS0940-42.  The Forest Service then conducted botanical surveys and field work during the summer of 2013 to evaluate the potential impacts that renewing Enbridge's special use authorization would have on wildlife. FS0144-70. The Forest Service also investigated whether Enbridge was in compliance with relevant environmental laws and the regulations issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA) of the U.S. Department of Transportation. FS0522-26; FS0774-75; FS0777; FS0780-85.

On January 29, 2014, the US Forest Service issued a scoping notice to the public, explaining that the Forest Service believed that renewing Enbridge's special use authorization qualified as a CE, and initiating a 30-day public comment period. FS0018-20.  On February 12, 2014, Plaintiff Sierra Club responded to this request for comments, arguing that the use of a CE was inappropriate. FS0107-11.  Specifically, Sierra Club argued that an analysis under NEPA had never been conducted on the Mio District Pipeline, that the renewal would not be purely administrative because flow through the pipeline and the number of pumps had increased, and that the 1992 Permit had already expired and so Enbridge's authorization could not be renewed. *Id*. In its comment, Sierra Club did not identify any cumulative impacts that needed to be assessed by the Forest Service that warranted additional review.  *Id.*

The Forest Service issued a Decision Memo signed by Regional Forester Kathleen A. Atkinson on December 10, 2014, granting renewal of Enbridge's special use authorization for

the Mio District Pipeline. FS0126-40. The Decision Memo included a biological assessment in which the biologists stated that the renewed permit would have no effect on the Kirtland Warbler, since under the 2015 Permit Enbridge would not be allowed to conduct any operation or maintenance activities within ¼ of a mile of the Warbler's breeding habitat from May 1 to August 15. FS0127. The assessment also stated that there would be little to no effect on any other protected species in the area. FS0151. The Decision Memo concluded that there were "no extraordinary circumstances which may result in significant individual or cumulative effects on the quality of the environment." FS0138.

The Forest Service issued a new Special Use Permit, MI0314, to Enbridge on September 1, 2015 ("the 2015 Permit"), granting renewed authorization under essentially the same terms as the 1992 Permit. ECF No. 51.  Like the 1954 Permit and the 1992 Permit, the 2015 Permit authorizes Enbridge to keep its existing Mio District Pipeline in the ROW and conduct any necessary operation and maintenance activities. *Id*. The permit states:

> This Permit issued for the purpose of: Operating and maintaining a 30 inch diameter, steel pipeline (which is buried at a minimum depth of four (4) feet) and associated facilities… for the transmission of petroleum and its products and derivatives.  This permit does NOT authorize new pipeline construction or reconstruction. Routine maintenance is authorized as defined in the Operation and Management Plan….

*Id*. Importantly, the permit does not restrict the amount of flow, nor the type or quality of petroleum, which is regulated by a different government agency, the PHMSA of the DOT. FS0788.

### B.

NEPA went into effect July 30, 1979. FS0100.  NEPA is a procedural statute that "does not require mandate particular results." *Winter v. Natural Resources Defense Council, Inc*., 557 U.S. 7, 23 (2008). The statute is action forcing, however, "in that it compels agencies to collect

and disseminate information about the environmental consequences of proposed actions that fall under their respective jurisdiction." Sw. Williamson Cnty. Cmty. Ass'n v. Slater, 243 F.3d 270, 278 (6th Cir. 2001) (quotations omitted. For this reason, "judicial Review of NEPA compliance is limited in scope. We ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Kentucky Riverkeeper, Inc. v. Rowlette,* 714 F.3d 402, 407 (6th Cir. 2013) (citing *Communities, Inc. v. Busey*, 956 F.3d 619, 623 (6th Cir. 1992)) (internal quotations omitted).  "Courts should give substantial deference to the regulations promulgated by the Council on Environmental Quality (CEQ), the federal agency established to fill in the gaps of NEPA's regulatory scheme." *Kentucky Riverkeeper*, 714 F.3d at 407.

The action-forcing procedures employed by NEPA require an agency to take a "hard look" at the environmental impacts of proposed actions. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989).  This "hard look" requires an agency to prepare a detailed environmental impact statement ("EIS") whenever a venture constitutes "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C) (2012).  In determining whether an action falls under this rule, CEQ authorizes agencies to first prepare a less-burdensome environmental assessment ("EA"). 40 C.F.R. § 1508.9(a)(1) "The EA is to be a concise public document that briefly provides sufficient evidence and analysis for determining whether to prepare an EIS." *Dep't of Trans. V. Pub. Citizen*, 541 U.S. 752, 757 (2004) (internal quotations omitted).

An agency does not need to follow this procedure, and thus does not need to prepare either an EIS or an EA, if the agency determines that the action falls within a CE. 40 C.F.R. § 1508.4.  A CE is defined as:

a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations…and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

40 C.F.R. § 1508.4.

The Forest Service has adopted a number of CEs under this rule, determining that any action that falls within one of its listed categories by definition does not have a significant effect on the human environment. Relevantly, the Forest Service's CE for Special Use Authorizations ("CE-15") categorically excludes:

Issuance of a new special use authorization for a new term to replace an existing or expired special use authorization when the only changes are administrative, there are not changes to the authorized facilities or increases in the scope or intensity of authorized activities, and the applicant or holder is in full compliance with the terms and conditions of the special use authorization.

36 C.F.R. § 220.6(e)(15). *See also* FS0116-25.  For actions taken pursuant to CE-15 no EIS or EA is required, but the Forest Service must create a supporting record and document its decision in a decision memo. 36 C.F.R. § 220.6(e). In the present case, the Forest Service determined that CE-15 applied, and created a supporting record and documented its decision in a decision memo. FS0126-40.

## II.

### A.

The motions now before the Court are the parties' cross-motions for summary judgment. The Sixth Circuit Court of Appeals has suggested, without deciding, that the use of summary judgment is inappropriate for judicial review of an administrative action under the APA. *Donaldson v. United States*, 109 Fed.Appx. 37, 39-40 (6th Cir. 2004); *Alexander v. Merit Sys. Prot. Bd.*, 165 F.3d 474, 480 (6th Cir. 1999).  The Sixth Circuit's primary concern is that review

of agency decisions via motions for summary judgment "invites improper consideration of evidence outside the administrative record and reliance upon post hoc rationalizations for the agency's action." *Alexander,* 165 F.3d at 480.  However, a district court may enter judgment in response to motions for summary judgment as long as the district court applies the proper standard and review is based on the administrative record. *Id.* at 480-81. *See also City of Cleveland v. Ohio,* 508 F.3d 827, 838 (6th Cir. 2007); *Taco Especial v. Napolitano*, 696 F.Supp 2d 873, 877 (E.D.Mich. 2010).

In reviewing a motion for summary judgment under the APA, "the standard set forth in Rule 56(a) does not apply because of the court's limited role in reviewing the administrative record."  *Coe v. McHugh*, 986 F.Supp.2d 237, 239 (D.D.C. 2013). In such a case, motions for summary judgment are merely the conduit to bring a legal question before the court. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999); *see also City of Cleveland,* 508 F.3d at 838.

Under the APA, a court must set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). To determine whether an agency has acted arbitrarily or capriciously, the Court should consider whether:

> The agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658, (2007).  However, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to

substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983).

Judicial review is generally limited to the administrative record that was before the agency at the time of its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 410-20 (1971). Based on the record before it, an agency is required to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, (internal quotation omitted). Therefore, a party challenging an agency action is required to "show that the action had no rational basis or that it involved a clear and prejudicial violation of the applicable statutes or regulations." *McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir.1987). A court must give an agency's interpretation of its own regulations "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, (1994) (internal quotations omitted).

## B.

Here, Plaintiff Sierra Club requests that the Court take judicial notice of a number of facts outside of the administrative record. Pl. Brief 7. Generally, courts confine their review to the administrative record, "which includes all materials compiled by the agency that were before the agency at the time the decision was made." *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (internal quotations omitted). The Sixth Circuit has allowed evidence outside the administrative record only where the plaintiff makes a showing that (i) there was deliberate or negligent omission of certain documents by the agency, or (ii) the court needs the evidence for certain "background" information in order to determine whether the agency considered all relevant factors. *See Latin Americans for Social and Econ. Dev. v. Adm'r of Fed. Highway*

*Admin.*, 756 F.3d 447, 464-65 (6th Cir. 2014); *Sierra Club*, 120 F.3d at 638.  In either case, the burden is on the plaintiff to make a "strong showing" of bad faith in order to justify supplementing the record. *Id.*

Plaintiff Sierra Club has not carried its burden. First, Plaintiff has made no claims whatsoever that the U.S. National Forest Service deliberately or negligently omitted certain documents. Second, although Plaintiff suggests that the Court may need background information to reach its determination, Plaintiff has made no showing of bad faith.

Furthermore, as pointed out by Defendant Forest Service, Plaintiff had a previous opportunity to challenge the sufficiency of the Administrative Record. *See* Def. Forest Service Brief 13, ECF No. 37. *See also* FS0187.  Plaintiff has provided no explanation as to why the material it now emphasizes could not have been submitted for consideration during the 30-day public comment period and thus made part of the administrative record. *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.* 576 Fed.Appx. 447, 487 (6th Cir. 2014). Plaintiff cannot argue that it was not aware of the comment period because Plaintiff in fact submitted a comment during that period. *See* FS0107-11. For these reasons, and in the strong interest of avoiding "improper consideration of evidence outside the administrative record and reliance upon post hoc rationalizations for the agency's action," Plaintiff's requests to supplement the Administrative Record will be denied. *Alexander,* 165 F.3d at 480.

### III.

Defendant U.S. Forest Service first argues that Plaintiff does not have standing to bring this action. Def. Forest Service Brief 10. The Forest Service argues that Plaintiff has not established that it will suffer an imminent, concrete injury from the Forest Service's decision to authorize Enbridge a Special Use Permit. *Id.*

Whether a party has standing under Article III of the Constitution is a "threshold jurisdictional question" that a court must decide before it may consider the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). To establish Article III standing, Plaintiff must show that: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) that it is likely—not merely speculative—that a favorable judicial decision will redress the injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The party seeking jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)*. An organization can assert the standing of its members, and its burden of establishing standing is satisfied if it makes specific allegations establishing that at least one identified member had suffered or would suffer harm. *Id.* at 563. "[W]hile generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." *Summers*, 555 U.S. at 494.

Through the Declarations of Thomas Buhr and Marvin Roberson Plaintiff has satisfied its burden of establishing standing.  The Buhr Declaration asserts that Buhr sits on the Board of Directors for Anglers of the Au Sable and edits their newsletter, The Riverwatch. Buhr Dec. 2, ECF No. 28. It also declares that Buhr lives and has an underground well not far from where Enbridge's pipeline crosses the river, and that he fishes and bikes in that area throughout the year. *Id*. The Roberson Declaration asserts that Roberson is the Saginaw Forest Policy Specialist for the Sierra Club's Mackinac Chapter, that he has been involved in Forest Planning and other activities on the Huron-Manistee National Forest since 1989, and that he regularly hikes and fishes around the Au Sable River in the area covered by the permit. Roberson Dec. 1-2, ECF No.

- 11 -

29.  These declarations sufficiently show that any harm caused by the Forest Service's issuance of the permit to Enbridge would affect the recreational interests of Plaintiff." *Summers*, 555 U.S. at 494.

## IV.

This brings us to the merits of the matter. Here, Plaintiff Sierra Club does not bring any facial challenge to the categorical exclusion at issue, CE-15, but only objects to its application to the present case.  The parties first dispute whether the Forest Service properly applied CE-15 in determining to reauthorize Enbridge's ROW for the Mio District Pipeline. The parties also dispute whether NEPA required the Forest Service to analyze the cumulative effects of the reauthorization, and whether the Forest Service was required to prepare an EIS.  For each of these disputes, the Court applies the deferential "arbitrary and capricious" standard to the Forest Service's decisions. 5 U.S.C. § 706(2)(A). *See also Alaska Center For Env't. v. U.S. Forest Service*, 189 F.3d 851, 857 (9th Cir. 1999) ("An agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard") (citation omitted); *West Houston Air Comm. v. FAA*, 784 F.2d 702, 705 (5th Cir.1986).

## A.

The parties first dispute whether the Forest Service properly applied CE-15 in reauthorizing Enbridge's ROW for the Mio District Pipeline. Plaintiff puts forth three arguments as to why use of CE-15 was inappropriate. First, Plaintiff argues that the plain language of CE-15 renders it inapplicable due to changes in the scope and intensity of the authorized activities. Pl. Brief. 16, ECF No. 27.  Second, Plaintiff argues that extraordinary circumstances exist in that the reauthorization may impact Kirtland's warbler, which is an endangered species. *Id*. at 17.   Third,

Plaintiff argues that the new permit is not simply an administrative continuance of the prior permit. *Id*. at 18.  Defendants, in turn, argue that Plaintiff's arguments are without merit and that application of CE-15 was appropriate because there were no changes to the scope and intensity of the activities regulated by the Forest Service, the decision will have no effect on Kirtland's warbler, and that renewal of the Special Use Permit constitutes only an administrative action that does not authorize any change to the existing pipeline. For the reasons set forth below, the Court agrees with Defendants and holds that Defendant Forest Service's application of CE-15 was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

### i.

In arguing that there have been changes to the scope and intensity of the authorized activity, Plaintiff misconstrues the scope of the permit granted to Enbridge by the Forest Service. The special use permit only authorizes Enbridge to maintain the Mio District Pipeline in the property owned by the Forest Service, and conduct any routine operations, maintenance, and repair. FS0792.  It in no way regulates the quality or volume of the oil moving within the pipeline, which falls under the jurisdiction of a different United States agency. FS0788.

The Forest Service's authority to issue special use permits derives from the Mineral Leasing Act, 30 U.S.C. § 185, which is concerned only with the use and occupancy of Forest Service lands and consistency with applicable land and resource management plans. *See* 36 C.F.R. Part 251. Therefore, the Forest Service only has the authority to authorize physical use and occupancy of its lands. FS0789. Product flow, pressure, and capacity, on the other hand, are extensively regulated by the PHMSA of the DOT. *See, e.g.* 49 C.F.R. § 195.106. *See also* FS0791. PHMSA's regulations dictate the operational capacity of Enbridge's Line 5 based on the

pipeline's particular characteristics, including its internal design pressure. FS0788-89. Plaintiff's discussion of flow is irrelevant, since the special use permit only authorizes the pipeline's physical location and related operations, maintenance and repair.

Additionally, Plaintiff makes no claim that the reauthorization *itself* will lead to changes in scope or intensity. In its brief, Plaintiff states that the amount of oil transported by the pipeline increased prior to the reauthorization in question. *See* Pl. Brief 16. This in itself is problematic for Plaintiff, since the question the Forest Service was confronted with in deciding whether to reauthorize Enbridge's special use permit was whether the reauthorization itself would result in "changes to the authorized facilities or increases in the scope or intensity of authorized activities." 36 C.F.R. § 220.6(e)(15). In renewing Enbridge's permit, the Forest Service is simply allowing Enbridge to keep the existing Mio District Pipeline on Forest Service lands and conduct routine operations, maintenance, and repair. FS0792. The reauthorization itself has not led to any changes in scope or intensity of the project. Instead, any changes to the pipeline activity are a result of pump upgrades prior to the Forest Service's decision, outside of the Forest Service's lands, and not within the Forest Service's jurisdiction. *See* FS1169.

Plaintiff in no way argues that the flow increase violates the terms and conditions of the 1992 Permit, nor does Plaintiff raise any argument whatsoever that the flow increase is otherwise forbidden by law or statute. *See* 36 C.F.R. § 220.6(e)(15). Because Plaintiff has not shown that the reauthorization itself caused any changes in the scope or intensity of the project, or that Enbridge violated the terms and conditions of its prior authorization in any way through the flow increase, Plaintiff's argument that a flow increase renders CE-15 inapplicable is without merit.

**ii.**

Plaintiff next argues that the Forest Service erred in applying CE-15 to the reauthorization because the project may impact Kirtland's warbler, which is an endangered species. *See* Pl. Brief 17.  However, as Defendants note, the mere presence of an endangered species in a project area does not prohibit the use of a CE. Moreover, the Service's Biological Assessment and Decision Memo specifically found that reauthorizing Enbridge's permit would have no impact on Kirtland's warbler. *See* FS0131; FS0148-52.

Under the Forest Service's guidelines, invocation of even an established CE is only appropriate where there are "no extraordinary circumstances related to the proposed action." 36 C.F.R. 220.6(a).  The guidelines set forth a number of resource conditions that should be considered in determining whether extraordinary conditions exist warranting further analysis. 36 C.F.R. 220.6(b)(1). One such resource condition is "Federally listed threatened or endangered species or designated critical habitat…." *Id.* at 6(b)(1)(i). However, the guidelines specifically provide:

> The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist.

36 C.F.R. 220.6(b)(2).  Thus under the rule the Forest Service can invoke a categorical exclusion even where an endangered species is present if the agency determines that the presence of the endangered species and the potential effects of the proposed action does not constitute extraordinary circumstances. *See, e.g. Utah Envtl. Cong. V. Bosworth,* 443 F.3d 732, 744 (10th Cir. 2006) (upholding use of a CE where some possible effects could result on a resource condition where those effects did not have the potential to be significant); *Sw. Ctr. For Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir. 1996) (holding that an

agency may invoke a CE even where endangered species are present if the agency determines that the project will not negatively impact the species).

Kirtland's warbler is the only federally-listed species known to occur on the Mio District. FS0148. Kirtland's warbler lives in the Lower Peninsula of Michigan only in the summer, and migrates to The Bahamas for winter. *Id*.  The species prefers to nest at the base of young jack pine trees, usually between the ages of 5-15 years old. *Id*. For this reason, Kirtland's warbler's breeding habitat changes as previous jack pines grow too tall, becoming unsuitable, and new areas of jack pines mature and become suitable. *Id*. For this reason, the population of Kirtland's warblers living in the Lower Peninsula of Michigan regularly shifts locations. *Id*.  As of the last census in June 2013, 738 singing males were found in the Huron National Forest, and although none were located in the ROW, birds were found nesting adjacent to the ROW. FS0150.

In considering both the direct and indirect effects that reauthorizing Enbridge's permit would have on Kirtland's warbler, the Forest Service concluded in its biological assessment that there would be no effect. FS0151-52. Plaintiff now argues that invocation of CE-15 was inappropriate because the Forest Service has not ensured that there will be no impact on the Kirtland's warbler. Pl. Brief 17. However, the Forest Service's biological assessment specifically and visibly states more than once that reauthorization will have no impact on the species. FS0151-52. The biological assessment explains that Kirtland's warbler do not inhabit the ROW. FS0151. And, under the 2015 Permit, Enbridge is not allowed to conduct any repair or maintenance activities within ¼ of a mile of the warbler's breeding habitat from May 1 to August 15. FS0127. Furthermore, any activities within or adjacent to the warbler's essential breeding habitat will be reviewed by a Mio District wildlife biologist prior to implementation. *Id*. During the breeding season, Enbridge is only allowed to inspect and conduct minor maintenance

of the Valley Road EFRD adjacent to Kirtland's warbler breeding habitat. FS0127. The 2015 Permit also authorizes walking within the pipeline ROW directly from Valley Road to the fenced area during the breeding season. *Id*. The biological assessment concluded that these activities would have no impact on Kirtland's warbler and that no habitat would be altered. FS0151-52.

Because the biological assessment found that reauthorization would have no effect on Kirtland's warbler, the Forest Service determined that there were no extraordinary circumstances preventing use of a CE. Under the deferential APA standard of review, Defendant Forest Service's determination that no extraordinary circumstances existed was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Thus Defendant Forest Service's use of a CE was appropriate in this regard.

**iii.**

Plaintiff Sierra Club also argues that Defendant Forest Service's use of a CE is inappropriate because the reauthorization was not a mere administrative change. Plaintiff contends that the 2015 Permit was in fact issued to an entirely different company than the 1992 Permit, and so does not constitute a mere administrative renewal. *See* Pl. Brief 18. This argument is also without merit.

As noted above, the 1992 Permit was issued after Lakehead changed its name to the Lakehead Pipeline Company, Limited Partnership, a Delaware Limited Partnership. *See* FS1044-45. Subsequently, on April 10, 2002, the 1992 Permit was amended after Lakehead changed its name to Enbridge Energy Limited Partnership (Enbridge). FS1058-70. The title page of that amendment specifically states that "only the name of the company has changed not the ownership" and that "[a]ll other conditions of the permit as amended, remain unchanged." *Id*. Therefore, since April 10, 2002, the special use authorization has been expressly granted to

- 17 -

Defendant Enbridge, the same entity that was issued the renewed 2015 Permit. ECF No. 51. If Plaintiff Sierra Club wanted to raise objections to the name change under the 2002 Amendment to the 1992 Permit, then Plaintiff needed to do so within the applicable six-year statute of limitations period. *See* 28 U.S.C. § 2401(a).  As it stands, the 1992 Permit was expressly granted to Enbridge through the 2002 Amendment, and the 2015 Permit has been issued to that same entity. Therefore, the re-issuance constitutes an administrative change to replace an existing permit within the meaning of CE-15. *See* 36 C.F.R. § 220.6(e)(15).

Plaintiff also appears to argue that the 2015 Permit was not a reauthorization pursuant to CE-15, but was instead a new issuance not within the scope of CE-15. Pl. Brief at 18. Plaintiff suggests that because the 1992 Permit expired over two years before the 2015 Permit was issued, the 2015 Permit cannot constitute a reauthorization of the expired 1992 Permit. *Id*. This argument is without merit for two reasons. First, because CE-15 expressly applies to expired licenses, and second, because it ignores the express language of the APA.

As provided in CE-15, "Issuance of a new special use authorization for a new term to replace an existing *or expired* special use authorization when the only changes are administrative…" *Id.* (emphasis added). Thus by its plain language, the CE explicitly covers expired licenses. Furthermore, the regulatory history of CE-15 shows that it was adopted in large part for the specific purpose of covering expired licenses. *See* FS0119-25. As explained in the July 2004 Federal Register Notice, a study undertaken in 1997 revealed that unprocessed applications for new special use authorizations to replace expired permits was a major cause of a backlog in the Forest Service's special use program. FS0120.  "The study concluded that a primary cause of this backlog is the inconsistent application and misinterpretation of agency policy… [regarding] categorical exclusion from documentation in an [EA] or [EIS]." *Id*. In 2001,

the Forest Service set forth interim guidelines advocating the use of categorical exclusions in reviewing authorizations for existing special use authorizations that had expired.  FS0121. After a comment period, the Forest Service adopted CE-15 in 2004. *Id*. Thus through its plain language and in light of its regulatory history, CE-15 applies to expired special use authorizations.

Even if CE-15 did not expressly apply to expired licenses, Plaintiff's argument would still be without merit. Under 5 U.S.C. § 558(c), "[w]hen the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency." *Id*.

Here, the 1992 Permit was set to expire on December 31, 2012. FS1049.  On September 26, 2012 Enbridge requested renewal of its special use authorization for the Mio District Pipeline. FS0190-96. This satisfied Enbridge's duty of "timely and sufficient application for a renewal or a new license." 5 U.S.C. § 558(c).  Therefore, under both CE-15 and the APA, the 2015 Permit was a proper administrative continuance of Enbridge's prior authorization.

**B.**

The parties next dispute the extent to which Defendant Forest Service was required to analyze the cumulative impacts and potential significant effects of the Mio District Pipeline reauthorization. Plaintiff argues that the Forest Service's decision memo violates NEPA because "it fails to account for the cumulative effects of project, the other past, present, and reasonably foreseeable projects and other ground-disturbing activities on the Forest; and fails to analyze the reasonably foreseeable direct impacts of the project." Pl. Brief 19. Defendants argue that reauthorizations under CE-15 by definition have no cumulative impacts on the environment. Forest Service Brief 24-25; Enbridge Brief 23-25.

- 19 -

As set forth above, 40 C.F.R. 1508.4 defines a Categorical Exclusion as:

a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations…and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

*Id*. Therefore, in creating the category of exclusions, the Forest Service determined that anything within the category by definition did not have a cumulative impact on the environment. *Id*. The Forest Service thus conducted the cumulative effects assessment for all actions that fell within CE-15 at the time it created the category, which was made public through the July 2004 Federal Register Notice. FS0119-25. *See also Ctr. For Biological Diversity v. Salazar,* 706 F.3d 1085, 1097 (9th Cir. 2013) ("[W]here a proposed action fits within a categorical exclusion, full NEPA analysis is not required"); *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 741 (10th Cir. 2006) (holding that no cumulative impact analysis was required when an action was covered by a CE because that assessment was already conducted as part of the creation of the exclusion). Additionally, as discussed above, Plaintiff has not sufficiently shown that any extraordinary circumstances prevent the Forest Service's use of a CE. *See supra* IV(A)(ii).  Therefore, because the renewed authorization fell within CE-15, The Forest Service did not act arbitrarily or capriciously in choosing not to conduct a full cumulative effects analysis.

## C.

Plaintiff's claim that an EIS was required because the project may significantly impact the environment may be similarly disposed of. *See* Pl. Brief 20. Plaintiff argues that the project may have a significant effect on the human environment in three ways: 1) uncertain risks due to the pipeline's age and lack of environmental review, 2) potential impact on the Kirtland's warbler, and 3) significant controversy surrounding the project. *See Pl. Brief* 20-25.  However,

by definition a categorical exclusion does not have a significant effect on the human environment. 40 C.F.R. 1508.4; *See also Utah Envtl. Cong.*, 443 F.3d at 741. Additionally, as discussed above, Plaintiff has not sufficiently shown that any extraordinary circumstances prevent the Forest Service's use of a CE. *See supra* IV(A)(ii).   Because the renewed authorization fell within CE-15, a significant impact analysis was not required and the Forest Service did not act arbitrarily or capriciously in determining that a full significant effects analysis was not required.

**V**.

Plaintiff Sierra Club has not shown that Defendant Forest Service acted in violation of NEPA or the APA in issuing Defendant Enbridge the 2015 Permit and allowing Enbridge to continue operating the Mio District Pipeline. Plaintiff has not met its burden under the APA of showing that Defendant Forest Service's renewal of Defendant Enbridge's special use authorization under CE-15 was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Consequently, Plaintiff's claims that Defendant Forest Service was required to analyze cumulative impacts or prepare an environmental impact statement are without merit.

Accordingly, it is **ORDERED** that Plaintiff Sierra Club's Motion for Summary Judgment, ECF No. 27, is **DENIED**.

It is further **ORDERED** that Defendant Forest Service's Cross Motion for Summary Judgment, ECF No. 37, is **GRANTED**.

It is further **ORDERED** that Defendant Enbridge's Cross Motion for Summary Judgment, ECF No. 40, is **GRANTED**.

It is further **ORDERED** that Plaintiff Sierra Club's Complaint, ECF No. 1, is

**DISMISSED with prejudice**.


                                                    s/Thomas L. Ludington
                                                    THOMAS L. LUDINGTON
                                                    United States District Judge

Dated: September 30, 2015

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on September 30, 2015.

                                    s/Michael A. Sian
                                    MICHAEL A. SIAN, Case Manager